**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 7** |
| | : | |
| **BRUCE L. FECHNAY,** | : | |
| | : | |
| Debtor(s) | : | **Bky. No. 07-14418ELF** |
| —————————————— | : | |
| | : | |
| **LYNETTE TAYLOR,** | : | |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 08-060ELF** |
| | : | |
| **BRUCE L. FECHNAY,** | : | |
| | : | |
| Defendant(s) | : | |
| —————————————— | : | |

# M E M O R A N D U M

## I. INTRODUCTION

In December 2006, prior to the commencement of this no-asset, chapter 7 bankruptcy case, Plaintiff Lynette Taylor ("the Plaintiff") filed a two (2) count complaint against Debtor-Defendant Bruce L. Fechnay ("the Debtor") in the Court of Common Pleas, Montgomery County ("the State Court Action"). In the complaint, the Plaintiff asserted causes of action for (1) assault and battery and (2) negligence and sought damages in excess of $50,000.00. The Plaintiff obtained an unliquidated default judgment in the State Court Action. However, before the state court held a hearing to assess damages, the Debtor filed his bankruptcy petition, staying the State Court Action. See 11 U.S.C. §362(a).

The Plaintiff initiated this adversary proceeding so that she might assess damages

against the Debtor in state court, liquidate her judgment and, thereafter, enforce the judgment against any non-exempt property the Debtor may acquire in the future, see 11 U.S.C. §522(c). In this court, she seeks a determination that her claim against the Debtor is excepted from the Debtor's chapter 7 discharge pursuant to 11 U.S.C. §523(a)(6).

The parties' dispute arises from a private therapy session that took place on December 28, 2004 ("the December 28th Session") between the Debtor, a clinical psychologist who has since lost his professional license, and the Plaintiff. The Plaintiff alleges that the Debtor engaged in inappropriate sexual misconduct and grossly unprofessional behavior during the session. The Debtor denies that any misconduct occurred. Rather, he contends that the Plaintiff arrived at her version of the events either by design (i.e., the Plaintiff fabricated her allegations in an attempt to jettison on-going couple's therapy in which she no longer wished to participate) or transference (i.e., the Plaintiff transposed a childhood trauma with her December 2004 therapy session, causing her to confuse the Debtor with the male family relation responsible for perpetrating her earlier trauma). There being no contemporaneous eyewitnesses or indisputable corroborating evidence, and the dispute between the parties being mainly factual, resolution of this adversary proceeding hinges largely upon an assessment of the relative credibility of the parties.

For the reasons that follow, by a preponderance of the evidence, I find in the Plaintiff's favor on the critical factual issues in this proceeding, and therefore, determine that her claim against the Debtor is nondischargeable under 11 U.S.C. §523(a)(6).

## II. **PROCEDURAL HISTORY**

The Debtor filed a voluntary petition for bankruptcy relief under chapter 13 of the Bankruptcy Code on August 2, 2007. (Bky. No. 07-14418). In Schedule F of his bankruptcy schedules and in his Statement of Financial Affairs, he identified the Plaintiff as a creditor and disclosed the existence of the judgment Plaintiff obtained in the State Court Action. (See Bky. Docket Entry Nos. 12, 22).

On December 18, 2007, the Debtor converted the case from chapter 13 to chapter 7. (Bky. Docket Entry No. 37). On January 25, 2008, the chapter 7 trustee filed a Report of No Distribution. On June 23, 2008, the Debtor received his discharge. (Bky. Docket Entry No. 62).

In the interim, on March 18, 2008, the Plaintiff commenced this adversary proceeding by filing a one (1) count complaint. (Adv. Docket Entry No. 1). In the complaint, the Plaintiff accuses the Debtor of having engaged in inappropriate sexual misconduct during the December 28th Session. She contends that such conduct constitutes an assault and battery and that she is entitled to an order excepting her claim from the Debtor's discharge pursuant to 11 U.S.C. §523(a)(6).

On April 23, 2008, the Debtor filed an Answer, denying the substantive allegations of the Plaintiff's Complaint. (Adv. Docket Entry No. 4).

The trial of this adversary commenced and was completed on May 15, 2009.[1] Three witnesses testified: the Plaintiff, Robert Madson and the Debtor. Additionally, both sides

---

[1] Prior to December 30, 2008, the Debtor's bankruptcy case and the Plaintiff's adversary were assigned to my former colleague, the Honorable Diane Weiss Sigmund. On December 30, 2008, a few months before Judge Sigmund's retirement, the main bankruptcy case and the adversary proceeding were reassigned to me.

introduced documents into evidence.[2]   Post-trial memoranda were submitted on June 1, 2009.

(Adv. Docket Entry Nos. 49, 50).


### III.  FACTUAL BACKGROUND

#### A.  The Debtor's Practice

The Debtor is a clinical psychologist with a doctorate degree in developmental

psychology.  (N.T. at 71).  By 2004, when he began treating the Plaintiff and her then romantic

partner, Robert Madson ("Madson"), the Debtor had been a practicing psychologist for over

twenty (20) years.  (Id.).  The Debtor conducted his practice out of an office located on the first

floor of his home in Dresher, Pennsylvania.  (N.T. at 71-72).


#### B.  The Plaintiff and Madson Enter Couple's Therapy

In 2004, the Plaintiff and Madson were in a committed, romantic relationship.  Although

the two never married, they considered each other husband and wife.  They had lived together

for approximately ten (10) years and were raising a son together.  (N.T. at 5).[3]

---

[2]       The Plaintiff moved into evidence Ex. P-1 (a 1994 Consent Agreement in
Commonwealth of Pa., Bureau of Professional & Occupational Affairs v. Fechnay, File No. 92-63-
02376), Ex. P-3 (the Final Adjudication and Order in Commonwealth of Pa., Bureau of Professional &
Occupational Affairs v. Fechnay, Docket No. 2170-63-06, File No. 05-63,00525, dated July 2, 2007), Ex.
P-4 (the state court complaint in Taylor v. Fechnay, No. 06-30805 (Montgomery Cty. C.P. Ct. 2006)),
and Ex. D-2 (Plaintiff's handwritten Statement of Complaint against the Debtor, filed with the
Commonwealth of Pennsylvania, Department of State on or about January 9, 2005).  The Debtor moved
into evidence Ex. D-1 (the Debtor's professional chart relating to his therapy sessions with Madson and
the Plaintiff).

[3]       The Plaintiff also has a son from a previous relationship.  The evidentiary record does not
reveal whether this son lived with Madson and the Plaintiff.

In the Fall of 2004, acting on his suspicion that the Plaintiff was having an affair, Madson sought to engage the Plaintiff in couples therapy.  (N.T. at 5-6, 14-15, 72-73).  He called and interviewed various therapists, including the Debtor, before ultimately deciding to meet with the Debtor.  (N.T. at 6).  Madson planned to meet with the Debtor alone first and then pursue joint sessions with the Plaintiff.  (N.T. at 6).

### 1.   December 2: the First Joint Therapy Session

The Plaintiff and Madson's first joint therapy session with the Debtor was held on December 2, 2007.[4]  (N.T. at 8; Ex. D-1 at 1).  It  lasted close to two (2) hours.  (N.T. at 76; Ex. D-1 at 1).  The Debtor took a "history" from the Plaintiff and Madson, (N.T. at 76), and the couple talked about their problems with communication and whether they wanted to work through those issues.  (N.T. at 30).  The session appears to have been largely unremarkable with two (2) exceptions.

First, Madson ascribed a distinct difference in behavior and language to the Debtor. While feeling that the Debtor was an "advocate" for him in his individual session, Madson said he felt like the Debtor treated him like the "bad guy" once the Plaintiff joined the therapy sessions. (N.T. at 8-9).  Madson also contended that the Debtor started using "F bombs," swear words and other language that Madson thought was inappropriate.  (N.T. at 9).

---

[4]       Before this joint session, Madson had initial session with the Debtor (and without the Plaintiff) that lasted approximately two (2) hours.  (N.T. at 75-76; Ex. D-1 at 1).  During the session, Madson and the Debtor discussed the reasons why Madson was interested in pursuing couple's counseling (including his suspicion that the Debtor was having an affair), the challenges Madson believed the couple was facing, particularly with communication and trust issues, and Madson's description of the couple's individual backgrounds.  (N.T. at 7).  During the session, the Debtor and Madson agreed that the couple should meet with the Debtor jointly to discuss their relationship issues.  (N.T. at 7).

The Debtor denied using any inappropriate language. (N.T. at 77-78). Additionally, he said that he told Madson in his individual session that, to gain the Plaintiff's "seminal trust" and obtain her participation in joint therapy sessions, the Debtor would need to take the Plaintiff's side initially and that Madson would have to be prepared to wear a "black hat" and be willing to focus on the "10 percent [of the couple's problems] that [was] his fault." (N.T. at 76-78).

Second, the Plaintiff became uncomfortable during the December 2nd session when Madson volunteered to the Debtor that the Plaintiff had been molested as a child. The Plaintiff said she does not like talking about this incident and considers this information personal and private, and something that Madson should not divulge without her permission. (N.T. at 32).

Otherwise, while describing herself as initially reluctant to go into therapy with a doctor who had already met with Madson and whom she therefore considered "Madson's doctor", the Plaintiff testified that the Debtor made her feel "validated" during this session. (N.T. at 31).

## 2. December 7th: Second Joint Therapy Session

The next joint therapy session took place December 7, 2004 and lasted approximately three (3) hours. (N.T. at 10, 32, 79; Ex. D1 at 1). The couple spent time talking about various situations from their past and present that caused them (or, primarily, the Plaintiff) to have trust issues. (N.T. at 32). The Plaintiff also shared "serious issues that were . . . hard for her," including, again, the childhood episode of molestation. (N.T. at 10, 32).

Madson testified that the December 7th session was marked by a continuation of certain behavior (i.e., he contends the Debtor consistently sided with the Plaintiff) and language that

upset him.[5]  The Debtor, on the other hand, said that, after these first three (3) sessions, he

believed that Madson and the Plaintiff were extremely pleased with the services he was providing

because they referred four (4) of their friends to him.  (N.T. at 80).

At the end of the December 7th session, it was suggested that the Plaintiff and the Debtor

have a private session at some point to work through issues from her childhood.  (N.T. at 32).

The couple subsequently made and cancelled three (3) appointments for a third

joint therapy session before it was determined that the Plaintiff meet the Debtor for an individual

session on December 28, 2004.  (N.T. at 80, Ex. D-1 at 1).


### C.  <u>December 28th: the Plaintiff's Private Therapy Session</u>

On December 28th, the Plaintiff met with the Debtor individually.  (N.T. at 33).  The

session lasted for the better part of a day, <u>i.e.</u>, it began at approximately 10:30 a.m. and ended at

approximately 4:00 p.m.  (Ex. D-1 at 1, N.T. at 81).

The session began with the Debtor taking the Plaintiff back to her earliest childhood

memories.  The Plaintiff described emotionally sensitive issues, such as arguments she overheard

her parents having, her father's abandonment of the family, and the Plaintiff's ensuing

relationship with her mother.  (N.T. at 82).  The Plaintiff told the Debtor she had trust issues

dating back from this time and that everywhere she went, she felt "abandoned or mistreated."

(N.T. at 34).

The session moved on to the details of the Plaintiff's allegations that she was molested by

---

[5]        Madson testified, "I again felt attacked because I – again, and I know I had my own
issues that I had to work on with [the Plaintiff], but it was very clear that I was the bad guy in the
situation and that's how I felt.  With all due respect, that's how I felt.  And you know, the language again,
you and the treatment, the way I was treated is how it felt to me."  (N.T. at 10).

a male family member when she was 12. (N.T. at 34). The Plaintiff became very emotional. (N.T. at 34 ("I was sobbing uncontrollably going into – and he wanted every single detail like to like what I was wearing. I mean, everything.")). In response, the Debtor got up and brought the Plaintiff tissues. (N.T. at 34).

From this point forward, the parties' accounts of what transpired during the remainder of the December 28th session differ vastly .

### 1. The Plaintiff's Version

The Plaintiff testified that the Debtor next told her that he wanted to move on to a different type of therapy – one he described as "unconventional." The therapy involved a book, The Velveteen Rabbit.[6] The Debtor told the Plaintiff that he had done this kind of therapy before with patients with a history of molestation and that it is called "touch therapy." (N.T. at 34).

Accordingly to the Plaintiff, the Debtor sat next to her on a sofa, put a pillow on his lap and made the Plaintiff lie on it while he read her The Velveteen Rabbit . In the Plaintiff's words, The Velveteen Rabbit is "about a rabbit that is a stuffed animal that's not real and he wants to be real, and all he really wants is to be loved, and [the Debtor] was pointing that out, you're [referring to the Plaintiff] like the velveteen rabbit." (N.T. at 61).

The Plaintiff said the Debtor read the book to her as though she were a child. (N.T. at 35-36). She estimated that it took the Debtor between 20 minutes to half an hour to read it to her. (N.T. at 66). While reading, the Debtor "kept maneuvering [her] body . . . [and] kept adjusting [her] on his lap." (Id.). The Plaintiff said that when the Debtor read something about the rabbit,

---

[6]        Margery Williams, The Velveteen Rabbit (1922).

he "bopped" her on the nose.  She said he also touched her hair.

The Plaintiff said she remembered looking up at times and finding that the Debtor was not looking at the book.  (N.T. at 36).  During this part of the session, the Plaintiff remembered that she was "listening to him, but not listening.  I was like kind of there, not there.  It was – I was definitely in a place where I was a 12-year-old girl again, absolutely."  (N.T. at 34).

The Plaintiff said the Debtor started touching her leg and told her she was "sexy" and that she "was driving him crazy."  (N.T. at 36).  She asserted that the Debtor "flipped" on top of her and "licked [her] face, . . . from [her] chin . . . all the way to . . . [her] nose."  (N.T. at 36).  The Plaintiff stated that the Debtor grabbed the inside of her thigh and put his tongue in her mouth.  She described feeling frozen and scared before gathering the conviction not to be victimized and exclaiming "Oh my God!"  (N.T. at 36).  She said the Debtor then abruptly got up and left the room.  (N.T. at 36).

The Plaintiff next heard a toilet flush in the house and then saw the Debtor re-enter the room.  She described him as "being completely different.  It was like he was one person and 30 seconds later he came back he was calm and not even that same man."  The Plaintiff said that, before the Debtor left the room, he was a "sweaty, panting, disgusting man.  He was like normal when he came back."  (N.T. at 58).

The session then ended.  The Debtor was already standing to leave when the Debtor re-entered the room.  (N.T. at 37).  He told her how much she owed, $975.00, and she paid by check and left.  (N.T. at 37).

After the session, the Plaintiff said she got in her car and called a friend, sobbing, telling the friend that something "crazy" had happened.  (N.T. at 37-38).  The friend and her husband

met the Plaintiff at the Plaintiff's home.  They advised the Plaintiff to call the police and cancel payment on the check she gave to the Debtor.  (Id.).  When Madson came home from work, the Plaintiff said she told him what had transpired and he began "freaking out."  (N.T. at 38).

Madson had an individual therapy session scheduled with the Debtor for the next day, but called and left the Debtor a voice message.  In the message, Madson objected to the length and cost of the December 28th session as being excessive and advised the Debtor that he was canceling payment on the check and canceling his upcoming session.  (N.T. at 15-20).  Madson did not mention any allegations of misconduct in the voice message he left for the Debtor on December 28th.  He explained this by stating that he did not believe in leaving threats on voice mail and thought it best to focus on the economic piece of his objection, because he and the Plaintiff would be dealing with the other piece separately.  (N.T. at 25-26).

The next day, the Plaintiff or Madson cancelled payment on the check the Plaintiff used to pay for the December 28th Session.  (N.T. at 38).

### 2.  The Debtor's Version

The Debtor told a very different story.

The Debtor testified that, while taking the Plaintiff through her family history, she described an event that occurred when she was twelve, while on a vacation in Florida with relatives (not her parents).  It involved her waking to find a male adult touching her inappropriately.  (N.T. at 83-84).  The Debtor stated that the Plaintiff did not go into detail concerning this event, other than to say that she had awoken "to this man feeling her up," and that "she was shocked, she kind of . . . froze, she depersonalized, she didn't know what to do, she kind

10

of went numb, and somehow it ended." (N.T. at 83). The Plaintiff also described feeling

betrayed and abandoned by her mother's response to her frantic phone call about the incident

("Don't worry about it. You're okay." "You'll get over it"). (Id.).

The Plaintiff told the Debtor that, since this event, she had never entirely trusted anyone.

(N.T. at 84). The Debtor said the Plaintiff told him that when men tried to get close to her,

because she assumed "they're after sex . . . [she would] seduce them and then . . . detach from

them and . . . [didn't] entirely know why." (N.T. at 85).

The Debtor said that the Plaintiff also revealed that she was "very money minded" during

the December 28th Session. (N.T. at 90). The Debtor testified:

> It seemed like she used men for money and used her savant's femme fatale
> charms to get whatever she wanted. And I've got quotes all over her history
> how she did – she was proud she did this with men; brought them down and
> used her charms and thought she was so sexy.

(Id.). The Debtor said the Plaintiff told him that she was more than likely going to go back to her

ex-husband, who had money, because Madson had none. (N.T. at 90, 93).[7]

The Debtor said he suggested to the Plaintiff that her current relationship with men might

be her way of exerting power, feeling safe, but never really letting anyone in or trusting anyone.

The Debtor said he also told the Plaintiff that she might be transferring some residual negativity

and distrust from her childhood traumas onto Madson. (N.T. at 82).

The Debtor testified that before he brought out The Velveteen Rabbit to show to her, the

Plaintiff told him that she believed that "all men in positions of authority abuse their power." (N.T

---

[7]    At trial, the Plaintiff unequivocally denied having voiced any interest in going back to
her former husband, who she says is re-married. (N.T. at 64-65).

at 85).  Allegedly in an effort to obtain the Plaintiff's trust, the Debtor told her about certain

patients he had treated in the past that had filed ethics charges and/or civil complaints against

him. The way the Debtor described it at trial, he told the Plaintiff that he, too, had abused his

power as therapist, but "accidentally."  The Debtor told the Plaintiff that in the 1990s, he had

treated a number of patients with "re-parental therapy," (N.T. at 85), a therapy his patients

sometimes called "hug therapy"[8] because it involved him holding them while reading The

Velveteen Rabbit.  (N.T. at 86).[9]  The Debtor told the Plaintiff that a patient to whom he had

administered this treatment "had become momentarily erotic" and "tried to kiss [him]," but he

would not let her.  (N.T. at 87). The Debtor revealed that this patient eventually filed a civil suit

and an ethics charge against him.  (N.T. at 122).[10]   He told the Plaintiff that he had proceeded

---

[8]  "I said hug therapy is what they called it when they put it in their ethics complaint."  (N.T. 86).

[9]       The Debtor testified that he learned this therapy at a three (3)-year institute called The Institute of Comprehensive Family Therapy.  (N.T. at 86).  He described the therapy as being based on the premise that it is beneficial to the patient for the therapist to take a posture with him or her that is much like what he or she did not get in childhood.  The Debtor stated:

> So if she didn't get a trusting father – and I tried this in 1989 to '90.  I had given these clients a trusting father figure because they had not had someone they could trust.  I held them.

(N.T. at 86).

[10]      The Debtor responded to these complaints.  (N.T. at 140).  The ethics complaints resulted in a Consent Agreement, which was admitted at trial pursuant to Fed. R. Evid. 415.  (See Ex. P-1).  In the Consent Agreement, the Debtor stipulated that the following facts were true:

> (1) that he employed "hug therapy" or "comprehensive family therapy" during individual counseling sessions with certain adult female patients,

> (2) that during a therapy session with one patient, he "experienced a strong countertransferential erotic impulse which caused him to lift [the patient's] blouse, revealing a few inches of her stomach, whereupon he immediately discontinued the contact";

12

with the "best of intentions that reading stories and holding a client was therapeutic and only after the fact when [the Debtor's patient] tried to kiss [him] did [he] realize that this was . . . not working for her and might not work for other clients in the future."  (N.T. 121-122).

The Debtor said he told the Plaintiff that he would not be using re-parental therapy with her, but instead would describe the story in <u>The Velveteen Rabbit</u> because he felt it was a "very applicable story" with useful metaphors.  (N.T. at 87).  He showed her the book, (<u>id.</u>), but did not read from it.  He suggested that she have Madson read it to her at home.

The Debtor testified that he never touched the Plaintiff while describing the story and its themes and never sat on the same sofa or chair with her.  (N.T. at 88).

The Debtor also admitted sharing certain confidences with the Plaintiff during the December 28th Session about his ex-wife and patients to convince her to under go a treatment known as Eye Movement Desensitization Reprocessing ("EMDR") (N.T. at 83).[11]   For example,

---

(3) that he used the same therapy with another patient in 1991 and, while holding the patient in his arms, "experienced her touch as erotic and felt a momentary impulse to act on that eroticized transference . . . . [and] immediately discontinued the contact";

(4) that he had voluntarily sought treatment for the personal issues that led up to these incidents; and

(5) that he has completely and voluntarily discontinued his use of comprehensive family therapy techniques.  (Ex. P-1, at 2-3).

Contrary to the Debtor's trial testimony concerning what he told the Plaintiff about these incidents, the Consent Agreement refers to <u>the Debtor</u>, and not the patient, as being the party that felt an erotic impulse during the administered therapy.

[11]       Briefly, the Debtor described EMDR as involving a therapy pursuant to which a patient is asked to think about the worst part of a personal trauma and then follow dots generated by a machine.  "It activates all the neurons and pathways and networks in [the patient's] brain so that anything associated with it gets stirred up and [the patient] can no longer just [stay] numb and avoid it."  (N.T. at 136).

the Debtor said he told the Plaintiff that his (now ex-) wife "of 12 years [had been] molested by

both her brothers."  (N.T. at 89).  He also said that his ex-wife was "very sexually inhibited."

(N.T. at 89).  He also admitted telling the Plaintiff about other patients -- although he testified that

he did so without naming names -- who had been raped "from age 4 into their 20's," including

one (1) patient who told the Plaintiff had been molested by her father for 20 years.  (N.T. at 89,

97).  His ostensible purpose for making these disclosures was to provide examples of individuals

who overcame the trauma of molestation through the use of EMDR and examples of people who

continued to suffer because they did not undergo EMDR.  (N.T. at 89).

The Debtor characterized the December 28th Session as "fantastic." (N.T at 89).

After receiving Madson's voice message objecting to the cost and length of the December

28th session, the Debtor tried to reach Madson and the Plaintiff by phone several times.  (N.T. at

95).  The Debtor said he reached the Plaintiff on her cell phone eventually, but that she hung up

when she realized it was him.  (N.T. at 95-96).  The Debtor said he got as far as, "Hi, Lynette.

This is Dr. Bruce Fechnay.  I wanted to talk to you about what happened," when the Plaintiff

hung up the phone.  (N.T. at 96).  The Debtor never pursued the Plaintiff's non-payment for the

December 28th Session or her cancelled check. (N.T. at 117-118).


D.  **The Parties' Conduct Following the December 28th Session**

1.  **The Plaintiff Seeks Additional Counseling; Madson and the
Plaintiff Separate**

The Plaintiff testified that, in the days following the December 28th Session, she was

immensely upset and did not get out of bed.  Emotionally, she felt that was back where she was

14

after she had first been molested as a child.  (N.T. at 38-39).

In January 2005, she sought additional counseling with a female psychologist.  (N.T. at 38-39).  The Plaintiff continued treatment with the female psychologist for three (3) or four (4) sessions.  (N.T. at 39).

In the spring of 2005, Madson and the Plaintiff separated.  (N.T. at 13-14).

### 2.  The State Board Complaint and Investigation

At her psychologist's urging, on or about January 9, 2005 (i.e., approximately 12 days after her private session with the Debtor), the Plaintiff filed a sworn, handwritten Statement of Complaint ("the State Board Complaint") against the Debtor with the State Board.  (See Ex. D-2, N.T. at 39, 49).

The Plaintiff's Statement of Complaint states:

> On Tuesday, December 28, 2004, I had an appt. with Dr. Bruce Fechnay - scheduled for 10 am.  I was kept waiting until 10:30 then we began.  To understand this situation better, you need to know that I have trust issues with men, stemming from my molestation by a male family member when I was twelve.  Dr. Fechnay and I spoke at length and in great detail about my molestation - especially when you know that my session that day was for 6 hours!  Yes 6 hours.  I didn't even realize I had been there that long until I noticed it was getting dark.  But I'm getting ahead of myself: During the session Dr. Fechnay had commented on how sexy I was.  He told me that I don't even know how sexy I am, it is just there and raw.  He talked about his sex life with his ex wife & ex girlfriend.  He told me that he had fallen in love with a former patient (who had also been molested) & he wanted to marry her - but she refused.  He had been very devasted [sic] by this and had written poems and he read them to me.  They were extremely personal.  I kept thinking to myself that this is part of my therapy and it must tie into what I need.  He then presented a book he wanted to read to me.  It actually is a child's story book called the Velveteen Rabbit.  He moved onto the sofa next to me, he told me to get comfortable as he adjusted a throw pillow onto his lap.  I just positioned myself on the other end of the sofa.  He told me that it was important for me to lie on the pillow to hear this tale about the Velveteen Rabbit.  I did as he said.  He moved my left arm (closest to his body) around his back and he

15

kind of cradled me on his lap like a child.  Even though it felt strange, I trusted
him.  He touched my hair as he read.  He changed his voice at times to sound like
he was reading to a child.  He adjusted me often on his lap.  He rubbed my thigh
while he read and kissed my forehead.  At one point, he moved my entire upper
body up so that our faces were very close and while his one hand was up the
back of my shirt, his other was rubbing the inside of my thigh, he continued to
read the story!  I have no idea where or how he held the book!  It scares me to
think he had it committed to memory.  At this point, he kissed me again on my
nose, then he took my hand and put one of my fingers in his mouth.  He told me
how aroused he was by me, then he kissed me on the mouth.  He put his tongue
in my mouth and then his finger.  He then licked my face, from my lips to my forehead
in one motion.  I pulled back and said, "What are you doing?"  He went back to
reading.  At the end of the story there is a fairy.  I commented that I had a fairy tattoo
on my back. He asked to see it.  I showed him and he kissed it.  We talked more about
the book and he related me to the rabbit.  It made sense.  I wanted it to.  He left the
room for awhile - maybe 5 minutes.  He came back, we talked more about me then he
told me my fee for the day was $975.  I paid him and left.

(Ex. D-2).

After she filed her State Board Complaint, the Plaintiff was interviewed by the State

several times.  (N.T. at 39).  Then, according to the State Board's records, on August 11, 2005, a

Professional Conduct Investigator scheduled an appointment with the Debtor for August 22, 2005

to follow up on the Plaintiff's allegations.  (Ex. P-3, at ¶17 p.12).  The Debtor did not meet with

the Investigator.

### a.   The State Board Issues An Order to Show Cause and Motion To Deem Facts Admitted; the Debtor's Decision Not to Respond

On or about December 20, 2006, the State Board issued a sixteen (16) count Order to

Show Cause  and served it on the Debtor.  (Ex. P-3, at 2, 14).

The counts included, inter alia:

(1) Violating Section 8(a)(4) of the Professional Psychologists Practice

16

Act ("the Act") by displaying gross incompetence, negligence or misconduct in carrying out the practice of psychology;

(2) Violating Section 8(a)(9) of the Act and Principle 3(e) of the State Board's Code of Ethics by engaging in sexual harassment of a client;

(3) Violating Section 8(a)(9) of the Act and Principle 3(e) of the State Board's Code of Ethics by engaging in sexual intimacies with a current therapy patient;

(4) Violating Section 8(a)(9) of the Act and Principle 6(b) of the State Board's Code of Ethics, which prohibits a psychologist from engaging in a dual relationship with a client that might impair professional judgment or increase the risk of exploitation; and

(5) Violating Section 8(a)(11) of the Act by engaging in immoral or unprofessional conduct.

(Ex. P-3, at 2-7).

The Order to Show Cause was served on the Debtor as was a subsequent Motion to Deem Facts Admitted.  After being served, the Debtor chose not to respond.  (N.T. at 124, 128).  Nor did he cooperate with the State Board's investigation (either by consenting to an in-person interview or by producing records).  The Debtor said that he recognized at the time that, if he did not participate in the State Board proceedings, he risked losing his license.  However, he testified that he was in the process of transitioning away from accepting insurance for reimbursement,[12] and believed that the only good reason to have a license was to have a number to write down on the insurance forms.  (N.T. at 140).[13]  He had already decided to let his license lapse.  (N.T. at

---

[12]    The Debtor testified that he had determined to stop accepting insurance because he has "four learning disabilities" and had a difficult time keeping up with the paperwork, co-pays and pre-certification requirements.  (N.T. at 140).

[13]    According to the Debtor, he could continue practicing in Pennsylvania without his license provided he did not call himself a "professional counselor" or "licensed professional counselor."  (N.T. at 144).

17

141).

While in the process of deciding whether to respond to the Order to Show Cause,

however, the Debtor typed a letter to the State Board, dated December 26, 2006.  He ultimately

decided not to send the letter, but to keep it in his clinical file for Madson and the Plaintiff.  (See

Ex. D-1 at p. 98-107).  In the letter, the Debtor accused the State Board of assuming a "guilty

until proven innocent" stance against therapists and of "set[ting] up the accused professional . . .

in a truly Franz Kafka (as in The Trail) [sic]" way.  (Ex. D-1 at 98).  He denied engaging in any

inappropriate behavior during the December 28th Session and accused the Plaintiff of having

"purposefully bastardized [his] session [with her] so as to take flight and cover her tracks in case

[Madson] ever had the courage to defy her and come in to see me again."  The Debtor wrote, "In

my fervent opinion, she has somehow gotten my ex-wife, the 1990 client, paranoid-filtered

preconceptions, and likely her own projected/disowned erotic fantasies all meshed/melded

together into a self-serving surrealistic Dali painting."  (Ex. D-1 at 105).  In closing, he stated

> I have decided, for now, to not send this in to [the State Board] as I'll just have to
> waste countless months/years in some agonizing 'defense' with little to no justice.
> However, this does clinically and legally belong as part of her and Bob Madson's
> chart.  Furthermore, it is possible that someday some BOPA, Psychology State
> Board member, or jury and judge will want or need to briefly hear the truth about
> Lynette Taylor.

(Id. at 107).


### b.  The State Board's Final Adjudication and Order

The State Board issued an order granting the Commonwealth's Motion and entered a

default, deeming certain paragraphs of the Order to Show Cause admitted.  (Ex. P-3, at 8).  As a

result, the Plaintiff's State Board Complaint culminated in a Final Adjudication and Order that

was issued on or about July 2, 2007.  (See Commonwealth of Pa. Bureau of Professional &

Occupational Affairs v. Bruce L. Fechnay, Ph.D., Docket No. 2170-63-06, File No. 05-63-00525;

Ex. P-3) ("the State Board Adjudication").  It includes some of the following findings of fact,

which the State Board deemed admitted by default:[14]

> In or about December 2004, Respondent agreed to provide co-joint couples
> therapy to [the Plaintiff and Madson] . . . .
>
> During these therapy session[s] Respondent would pace and scream "what
> the f[***]."
>
> On December 28, 2004 [the Plaintiff] met with Respondent . . . for the purpose
> of individual therapy . . . [that] lasted for approximately six hours.
>
> During [the December 28th Session] Respondent disclosed:
>
>     a.   That he was divorced;
>     b.   His ex-wife was psychotic;
>     c.   His ex-wife had issues with sex because she had been raped by her
>          father and brother;
>     d.   His ex-wife liked to be treated like a baby;
>     e.   That he had had a sexual relationship with one of his past patients;
>     f.   That, while in college, a woman had told him that he was an awful lover so he

---

[14]     The State Board Adjudication was entered with respect to a proceeding in which the
Debtor did not participate or defend himself.  No party has contended that the State Board's findings are
binding upon the bankruptcy court in this adversary proceeding.  See generally McGill v. Southward
Realty Co., 828 A.2d 430, 435 (Pa. Commw. Ct. 2003) (default judgment does not have preclusive effect
with respect to issues that were not actually litigated).

        Thus, my purpose in examining the findings of fact in the State Board Adjudication is not
to accept them as binding, litigated findings.  Rather, I have considered them for purpose of making the
necessary credibility determinations in this case.   They are probative in my assessment of (1) the
Debtor's motivation in deciding not to defend himself before the State Board and (2) the Debtor's
contention that all he stood to lose by failing to respond to the State Board Complaint was his license .
Because the findings in the Final Adjudication are taken from the Order to Show Cause that was served
on the Debtor, (see Ex. P-3, at 7, 14)), reviewing them permits me to know the nature of the allegations
the Debtor knew that he was facing.

had decided to become an excellent lover, particularly at oral sex;

g.   That he had used a match making service and had a date New Years.

Also during that session Respondent . . . told [the Plaintiff] she was sexy . . ., that
she did not know how sexy she was and that it was "raw"; [and] [r]ead [the Plaintiff]
poems he had written to ex-girlfriend.

(Ex. P-3, ¶¶5, 7, 9. 10, 11, 13).

The State Board Adjudication also contained findings that the Debtor used <u>The Velveteen</u>

<u>Rabbit</u> during the counseling session, sat down next to the Plaintiff on a couch in his office,

placed a pillow on his lap and told the Plaintiff it was important for her to lie on it while she heard

the book.  (<u>Id.</u>, ¶13. f., g.).  While reading the book to the Plaintiff, the Debtor is described as

having:

(1) told the Plaintiff "she had barriers he could feel";

(2) told the Plaintiff her mouth was sexy;

(3) touched the Plaintiff on her nose and stroked her hair;

(4) kissed her on the forehead several times;

(5) sucked her middle finger;

(6) told her that he was "turned on";

(7) rubbed her inner thigh;

(8) kissed her on the mouth using his tongue; and

(9) licked her face from her lips to her forehead in one motion.

(<u>Id.</u> ¶14).

In one section of its legal conclusions, the State Board observed that:

Respondent's conduct reflects gross incompetence, negligence or misconduct
as well as immoral or unprofessional conduct as the standard of care within
the practice of psychology for more than three decades has been to bar sexual

20

intimacies with current patients.  Beginning in 1977 and continuing in each revision thereafter, the American Psychological Association's Code of Ethics has prohibited sexual intimacies with current therapy patients.

Additionally, although Ethical Principle 6(b) of the Board's regulations had made it unethical for psychologists to engage in sexual intimacies with current patients as of March 18, 1978, an outright bar against psychologists engaging in sexual intimacies with current patients was published in proposed form in 1998 and added to the Board's regulations in 2000.  As the preamble to the proposed regulations made clear, within the definition of sexual intimacies, "not only sexual intercourse but, also, any other type of inappropriate sexualized behavior or nontherapeutic touch" is prohibited.[15]  Moreover, eleven years prior to [Respondent's] conduct, in Giddings v. State Board of Psychology, [669 A.2d 431] [Pa. Commw. Ct. 1995], and again two years later in Morris v. State Board of Psychology, 697 A.2d 1034 [Pa. Commw. Ct. 1997], Commonwealth Court upheld the Board's disciplinary sanctions against psychologists who engaged in sexual intimacies with current patients.

Despite the standard of practice within the psychology profession, case law and an outright regulatory prohibition for more than four years, Respondent engaged in sexual intimacies with [the Plaintiff] during a therapy session.

Even excluding the sexual intimacies, Respondent's conduct during the six-hour session grossly deviated from the standard of care.  It is simply not within the standard of care for a psychologist to have a patient lie on a pillow with her head in his lap with his hand between her thighs while he reads her a children's book or to disclose to a client/patient that a former partner told him that he was an awful lover . . . .  Similarly, it is not within the standard of care for a psychologist to tell a patient that she was sexy.

As such, the Board is satisfied that the record contains substantial evidence that Respondent engaged in gross incompetence, negligence or misconduct . . . .

---

[15]    In a footnote, the Board explained the reason for this prohibition by quoting the Preamble to its regulations, as follows:

> The sole goal of the therapeutic alliance is to help the patient.  During the therapeutic relationship, trust, openness and empathy are promoted, dependency often develops and confidences are fostered.  For sexual intimacies to intrude upon this relationship, . . . distorts therapy, creates unrealistic expectations and shame in the patients, and exploits the patient's trust and dependency.

(Ex. P-3 at 23 n.12 (citing 28 Pa. Bull. 1421 (Mar. 21, 1998)).

(Ex. P-3, at 21-24) (internal citation omitted).

As a sanction, the State Board ordered that the Debtor's license be revoked effective August 1, 2007.  (Ex. P-3, at 26).

### 3.   The State Court Action

On or about December 20, 2006, while the State Board matter was pending, the Plaintiff filed a complaint against the Debtor in the Montgomery County Court of Common Pleas ("the State Court Complaint").  The Plaintiff asserted counts for assault and battery and negligence based on the Debtor's alleged conduct during the December 28th Session.

The Debtor was served with, but did not respond to the State Court Complaint.  (N.T. at 131).  At trial in the adversary proceeding, he stated that he had no malpractice insurance and no money to hire attorneys to defend the litigation.  (N.T. at 145).

On May 3, 2007, the Plaintiff obtained a default judgment against the Debtor. Subsequently, on August 2, 2007, and prior to there being any assessment of damages hearing in the State Court, the Debtor filed a petition for bankruptcy relief.  See In re Fechnay, No. 07-14418 (Bankr. E.D. Pa.).  The filing of the bankruptcy petition automatically stayed the State Court Action.  See 11 U.S.C. §362(a).

### E.  The Treatment Notes for the December 28th Session

I was offered one last piece of evidence to assist me with regard to my factfinding relating to the December 28th Session.

To support his version of what occurred during the December 28th Session, the Debtor

22

introduced Exhibit D-1 into evidence.  The Debtor testified that D-1 constituted his entire clinical

record relating to his sessions with Madson and the Plaintiff.  (N.T. at 148).[16]

The progress notes and history part of Exhibit D-1 purport to provide me with a narrative

of what transpired during the various therapy sessions Madson and/or the Plaintiff had with the

Debtor.  This part of the clinical file is written in many different colored inks and contains several

interlineations.  The entries do not all appear to be contemporaneous.  Some of the interlineations,

for example, appear to have been written at a later time than the main text and seem to have been

included in anticipation of issues that might arise in litigation of the adversary.  For example,

presumably anticipating that the six (6) hour length of the session would be at issue, the Debtor

has interlineated on one page of the treatment notes for the December 28th session, "session

extended lots here on in because she never opens up like this (!), so she needed/wanted to extend

session . . . [I doubt she can do this very often again due to her Paranoid P.D.] . . . [t]his marriage

is in even worse crisis than I thought."  (Ex. D-1, at 8).

Similarly, one of the Debtor's theories in this case has been that the Plaintiff fabricated

her version of the December 28th session to avoid having Madson return to treatment with the

Debtor where he might learn her "secrets."  Near a section of the progress notes where the Debtor

describes the Plaintiff as relating a desire to return to her ex-husband, the Debtor has written and

enclosed in a red bubble, "confidential - 'keep these secrets of mine away from Bob!'" (Ex. D-1,

---

[16]        Page 1 of D-1 consists of a list of dates of contact the Debtor had with Madson or the
Plaintiff, the length of the contact/session and how much the Plaintiff/Madson paid for the session.  (N.T.
at 152).  On page 2, the Debtor explains symbols he uses in his clinical notes.  (Id.).  Several pages
thereafter constitute progress notes.  (Id.).  D-1 also includes copies of select pages of the Diagnostic and
Statistical Manual of Mental Disorders (DSM) -IV (relating to Dependent Personality, Paranoid
Personality, Narcissistic Personality and Histrionic Personality Disorders), notes from a book on
dissociative personality disorders, an article about post-traumatic stress disorder, two sheets on EMDR
and other articles.  (N.T. at 152).

at 8).

The Debtor's treatment notes for December 28th also purport to quote passages of

conversation between the Plaintiff and the Debtor.  For example, the Debtor describes the

following exchange as having occurred after the Plaintiff listened to the Debtor talk about <u>The</u>

<u>Velveteen Rabbit</u>:

> The Plaintiff:
>
> > "You seem so trustworthy, Bruce, kinda like the trustworthy 'Skin
> > Horse' or 'The Boy' you described in <u>The Velveteen Rabbit</u>."
> >
> > "Bruce, why don't you just take care of me?! [P]rove to me you are truly
> > able to love & protect me ?!"
>
> The Debtor:
>
> > I gently laughed at this wonderful FANTASY of ideal and magical reparation yet
> > gently also told her how I'd once believed a therapist [could] indeed provide that
> > 'reparenting' and 'transitional love', only to end up lost in this omnipotent role
> > that eventually tragically hurt a client in 1991 – such that she tried to kiss me but I
> > [said] "No, that [would] be exploitative of your trust much like your (eventually)
> > sexually molesting brother".  Lynette seemed <u>frustrated</u> and <u>perplexed</u> at first,
> > thinking my compassionate attitude and nurturing posture was meant to offer her
> > something 'more' (like 'REAL' love or whatever she never got from her mother or
> > father . . .).  I pointed out that "the true person who's <u>been</u> providing this 'Wooden
> > Horse' and/or 'Boy' and/or "Fairy Magic" was actually [Madson] . . . .
> >
> > Lynette seemed BOTH excited, intrigued and hopeful <u>AND</u> pessimistic, ashamed
> > and angry [and/or] perplexed about what to do.  She suddenly wanted to show me
> > her "Fairy tatoo on [her] upper butt"! which I gently [said] "No" to "as that
> > [would] be just like your (usual) need to prove <u>all</u> men are out to simply use you
> > [and] your natural charm/beauty [and] sexiness!"
> >
> > This seemed to have a deep and meaningful impact on Lynette – she saw the value
> > in <u>not</u> self-fulfilling her usual . . . cognitive (self-protective) expectational set.
> >
> > We set up our next app't along with my promise to help Bob . . . .  The session

24

went great, all in all, although replete [with] some dangerous precipices (!).

(Id. at 10-13) (emphasis in original).

## IV. **FACTUAL FINDINGS REGARDING THE DECEMBER 28th SESSION**

Having carefully reflected upon the testimony, documentary evidence and arguments of counsel and having evaluated the credibility of the parties with respect to their conflicting testimony, I find it more likely than not that the Debtor did engage in the sexual misconduct the Plaintiff described at trial. My conclusion is influenced by a number of factors.

The first factor concerns the parties' motivations. I observed the Plaintiff as she testified at trial. She was tense and very emotional during certain points in her testimony. Not only was she asked to testify about what happened on December 28th, but also to share confidences and information openly she considers private and painful, especially regarding her earlier childhood trauma. I credit her testimony that she does not find it easy or pleasant to relive certain parts of her past. She began to break down, emotionally, during this part of her testimony at trial. As such, I do not believe that the Plaintiff commenced the litigation process (be it before the State Board, the State Court or in this court) lightly.

Given this observation, and the seeming genuineness of the Plaintiff's testimony, I do not credit the Debtor's theory that the Plaintiff fabricated her story, and then went on to lodge a complaint with the State Board (and endure a series of interviews in that process) and a civil complaint with the State Court and an adversary proceeding with this court, simply to avoid having to undergo further joint therapy sessions with Madson. The conduct, and the impact it has had on the Debtor's life is disproportionate to the goal the Debtor claims it was meant to

25

accomplish.  Further, I consider such alleged conduct to be out of character for the Plaintiff.  I believe that, had she wished to discontinue therapy, she would have felt comfortable telling Madson so.

Nor do I believe that the Plaintiff made up a story to tell Madson because she wanted to discourage him from seeking further counseling from the Debtor or to discourage the Debtor from revealing the Plaintiff's "secrets" to Madson.  The Debtor has not established that the Plaintiff shared any particular secret that was of concern to her, as I do not credit the Debtor's suggestion that the Plaintiff voiced a desire to go back to her ex-husband, a then re-married man.  However, even if the Plaintiff had shared some confidence, I consider it more likely that the Plaintiff would expect the Debtor, as a psychologist, to be bound by ethical and professional rules that would constrain his ability to share one client's confidences with another.  I do not find it likely that some fear of discovery motivated the Plaintiff to make such serious allegations or to continue to pursue those allegations some years later when her relationship with Madson had already concluded.

There is some surface appeal to the Debtor's final theory concerning why the Plaintiff might have accused him of things that were untrue – i.e., that the Plaintiff's version of events can be explained by a phenomenon pursuant to which she  mistook the Debtor for the perpetrator of her childhood molestation and, in essence, transposed her earlier trauma on the December 28th Session and imagined that something happened, when it did not.  The Plaintiff lent some credence to this theory when she testified that, during the time the Debtor read her The Velveteen Rabbit, she was transported back to when she was 12 years old.  (N.T. at 34).

However, the similarity between the childhood episode and the Plaintiff's version of what

26

happened on December 28th ends at the very superficial – namely, that, in both settings, the

Plaintiff's trust was betrayed and/or exploited by an adult male in whom she had vested

confidence.  The scant details in the record concerning the Plaintiff's childhood molestation

suggest that it involved groping.  The Plaintiff's version of what occurred on December 28th

includes unusual allegations, such as that the Debtor "licked [her] face . . . from [her] chin . . . all

the way to . . . [her] nose."  (N.T. at 36).

Additionally, the "trigger" for the Debtor's sexual misconduct in the Plaintiff's version of

what happened on December 28th involves the reading or re-telling of The Velveteen Rabbit.

According to the Consent Agreement that was introduced at trial, (and accordingly, by the

Debtor's own admission), this particular child's story has triggered an inappropriate eroticized

response from the Debtor in past therapeutic counseling sessions with other patients.  I find it

more likely than not that the telling of this tale again triggered something in the Debtor on

December 28th, causing him to grossly overstep professional boundaries and exploit the Plaintiff's

vulnerability by engaging in unwanted and uninvited sexual misbehavior.

Portions of the Debtor's "treatment notes" for the December 28th Session also cause me to

consider it likely that, at some point during the therapy session, the Debtor lost sight of the

session's therapeutic purpose and began to indulge in fantasy.  In one section of the notes, the

Debtor describes a scene in which the Plaintiff asks the Debtor to take care of her, and urges him

to prove to her that he can love her and protect her.  (Ex. D-1, at 10-13).  He describes himself as

having "gently laughed" at this ideal and magical fantasy of reparation. Having observed the

Plaintiff at trial, I do not credit this passage as reflecting an actual conversation that occurred

during the December 28th Session; rather, it more likely reflects the Debtor's own misplaced

27

fantasies.  And, the degree of detail and literary flair exhibited in the treatment notes suggest that they were not prepared contemporaneously or nearly contemporaneously with the sessions, but rather at a later time when the Debtor was preparing a defense to the Plaintiff's allegations.

In sum, I do not find any of the Debtor's various theories of why the Plaintiff might have been motivated to lie about what happened during the December 28th Session credible.  I believe the Plaintiff found re-visiting this particular session (and the re-telling of her childhood trauma) painful and was more likely than not motivated to do so by the truth.

My resolution of the conflicting testimony also is influenced by the Debtor's failure to defend himself against the Plaintiff's allegations before the State Board or in State Court.

I find unconvincing the Debtor's testimony that his decision not to defend against the Plaintiff's allegations to the State Board was motivated by a change in the business model of this private practice  – i.e., that he had decided to cease seeking insurance reimbursements, thereby rendering superfluous his professional license.  As set forth above, the State Board's Order to Show Cause set forth serious allegations of gross incompetence and professional misconduct. Those allegations not only posed a risk to the Debtor's professional license, but also impugned his personal and professional integrity.  Regardless whether the Debtor wished to continue to hold a license, I question why, if the Plaintiffs' allegations were false, the Debtor would not feel compelled to clear his name.

Furthermore, by the time the State Board proceeding progressed to the point that the Order to Show Cause had been issued and served on the Debtor, the Plaintiff had already commenced litigation in State Court.  (See Ex. D-1, at 98-99).  At that point, the Debtor had reason to believe the Plaintiff intended to pursue her allegations further and that the matter would likely involve

more than just his professional license.  His failure to participate or defend himself in the State

Board proceedings raises questions concerning his veracity.[17]

The Plaintiff's conduct subsequent to the December 28th Session also leads me to conclude

that the Plaintiff was more than likely telling the truth.  She immediately called a friend for help

following the December 28th Session.  She also canceled payment on the check she gave to the

Debtor the next day and sought additional counseling.  Less than two (2) weeks after the session,

she filed a complaint with the State Board.  She voluntarily cooperated with state investigators

and was interviewed several times.  She commenced litigation in State Court.  She filed an

adversary proceeding in this court five (5) years later.  I am satisfied that, on the whole, the

Plaintiff acted as someone who was the victim of the conduct she alleged occurred.

Finally, in crediting the Plaintiff's testimony, I have considered the overall consistency of

her allegations to the State Board, the State Court and at trial in this court, particularly with

regard to the details of the physical touching that she says occurred.  I am mindful that certain

allegations in the State Board Complaint, as well as the information provided to State Board

investigators that resulted in the Order to Show cause, provide details concerning the December

28th Session that were not part of her trial testimony.[18]  However, the information the Plaintiff

---

[17]     In contrast, I can accept the Debtor's explanation that he failed to respond to the State
Court Action because he had run out of funds with which to hire an attorney and was in the process of
planning for bankruptcy.

[18]     Most notable is the difference between Plaintiff's statement to the State Board and her
trial testimony regarding the events that took place immediately after the alleged unwanted physical
intimacies.  According to the Plaintiff's statement to the Board, immediately after the Plaintiff  "pulled
back" from the Debtor's advances, the therapy session appeared to have resumed, almost as if nothing
improper had just taken place: the Debtor resumed reading The Velveteen Rabbit, the Plaintiff disclosed
that she had a fairy tattoo on her back, she showed the tattoo to the Debtor, permitted him to kiss it and
then engaged in further discussions about The Velveteen Rabbit, all of this culminating in the Plaintiff's
statement that "[i]t all made sense." By comparison, at trial, the Plaintiff described the session as ending
almost immediately after the Debtor's advances.

gave to the State Board was at a time when the details of the December 28th Session were much

fresher and clearer in her mind.  The trial in the adversary proceeding occurred some five (5)

years later and the Plaintiff testified that she was not shown a copy of her State Board Complaint

prior to testifying in the adversary trial.  (N.T. at 68.)  I am satisfied that the passage of time

adequately explains any differences in the descriptions the Plaintiff has given of the December

28th Session.[19]

    In sum, on balance, I find that the Plaintiff has established by a preponderance of the

evidence that her version of what occurred during the December 28th Session was truthful.

## V.  LEGAL CONCLUSIONS

    The Plaintiff seeks a determination that the debt owed to her by the Debtor is excepted

---

[19]    That said, insofar as the Plaintiff's statement to the State Board suggests that the session concluded with a resumption of a more conventional therapy interaction (conventional, except for the kissing of the tattoo) and ended on a positive note, one might wonder why the Plaintiff would resume a therapeutic interaction with the Debtor immediately after being assaulted.  Further, the Plaintiff's statement to the State Board might be interpreted as supporting that the Debtor's assertion that the alleged inappropriate behavior alleged was a figment of the Debtor's imagination brought on by a transference reaction. On the other hand, it is also possible to harmonize the Debtor's post-assault behavior (as described in the Statement to the Board) with an assault having occurred.  The Plaintiff's passivity immediately after being subjected to the Debtor's advances and her behavior in resuming a therapy session may have resulted from her shock at the Debtor's behavior; or the therapy session may have returned her to the vulnerable psychological state of a twelve year old; or it may have been a product of her inherently weaker position in the patient-therapist relationship.

    Thus, while it is possible to draw some inferences from the Plaintiff's statement to the State Board that support the Debtor's version of the events, the evidence is not compelling and certainly not decisive.  Based on the possible inferences described above, I am not prepared to credit the Debtor's version of the events.  Rather, I am convinced by a preponderance of all of the evidence in the record that the Debtor committed the physical assault the Plaintiff described in a consistent fashion to both the Board and this court.

from discharge by 11 U.S.C. §523(a)(6).  Section 523(a)(6) provides that a chapter 7 discharge does not discharge "an individual debtor from any debt . . . for <u>willful and malicious injury</u> by the debtor to another entity or to the property of another entity . . . ."  <u>Id.</u> (emphasis added). Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors.  <u>E.g.</u>, <u>In re Cohn</u>, 54 F.3d 1108, 1113 (3d Cir. 1995).  Additionally, as with other §523(a) exceptions, the creditor (here, the Plaintiff) bears the burden of demonstrating nondischargeability by a preponderance of the evidence.  <u>See, e.g.</u>, <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991); <u>In re Graham</u>, 973 F.2d 1089, 1101 (3d Cir. 1992).

The key language in §523(a)(6) – <u>i.e.</u>, willful and malicious – has been interpreted as embodying two distinct requirements.  Alan N. Resnick & Henry J. Sommer, 4 <u>Collier on Bankruptcy</u> ¶523.12[2] (16th ed. 2009) ("<u>Collier</u>").

With respect to the first element, the "willfulness" component, the United States Supreme Court has clarified that the word "willful" modifies the word "injury," such that nondischargeability under §523(a)(6) "requires a deliberate or intentional <u>injury</u>, not merely a deliberate or intentional act that leads to injury."  <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998). With respect to the second component, "malice," courts have interpreted this requirement as necessitating injuries that are "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.'"  <u>Collier</u> ¶523.12[2], at 523-92.

Putting those two (2) requirements together, to fall within the scope of §523(a)(6), there must be a deliberate or intentional injury, and the debtor must have intended the injury, rather than simply the act that caused the injury.  Nevertheless, it is possible to infer the requisite intent from the nature of the debtor's conduct:

> In the overwhelming majority of cases, courts have [held] that the "willful and
> malicious" nature of the injury caused by a debtor's conduct may be inferred from the
> nature of the act itself.  In the majority view, malice can be inferred from deliberate
> conduct that "necessarily produces harm or which has a substantial certainty of
> causing harm and is without just cause or excuse."

In re Jacobs, 381 B.R. 128, 137 (Bankr. E.D. Pa. 2008) (citations omitted); see also In re Granoff,

250 Fed. Appx. 494, 495 (3d Cir. 2007) (not precedential) ("debtor's actions are willful and

malicious under §523(a)(6) 'if they either have a purpose of producing injury or have a

substantial certainty of producing injury'") (quoting In re Conte, 33 F.3d 303, 307 (3d Cir.

1994)).

There is no disagreement between the parties with respect to the law governing the present

case.  The Debtor's counsel conceded in closing arguments that if I were to adopt the Plaintiff's

version of events, then it would be legally appropriate to find in the Plaintiff's favor with respect

to the nondischargeability determination under §523(a)(6).  (N.T. at 192-193).   Therefore, the

case hinges almost entirely on my credibility determinations and fact finding.

As explained above, I have resolved the credibility issues in the Plaintiff's favor and

found that the Debtor engaged in grossly unprofessional sexual misconduct during the December

28th Session that amounted to sexual battery.  Consequently, I conclude that the Plaintiff proved

facts sufficient to constitute the intentional tort of battery, which "is defined as a 'harmful or

offensive' contact with the person of another".  C.C.H. v. Philadelphia Phillies, Inc., 940 A.2d

336, 340 n.4 (Pa. 2008) (quoting  Dalrymple v. Brown, 701 A.2d 164, 170 (Pa. 1997)).

Further, as the State Board noted in its Final Adjudication, the Psychology Board's

regulations have made it unethical to engage in sexual intimacies with a patient since 1978 and

have barred such sexual intimacies since 2000 because "sexual intimacy . . . distorts therapy,

creates . . . shame in patients and exploits the patient's truth and dependency." (Ex. P-3, at 21-24).  The Debtor, an experienced clinical psychologist, surely was aware and, in any event, is charged with the knowledge that engaging in the sexual intimacies or misconduct that he did on December 28th would cause (as it did) emotional injury to the Plaintiff.  See, e.g., In re Roe, 274 B.R. 61, 64 (Bankr. D. Conn. 2004) (finding that malice may be implied "when anyone of reasonable intelligence knows that the act is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another") (citations omitted). The Debtor's conduct was deliberate and amounted to an intentional tort that had a substantial certainty of causing injury to the Plaintiff.  Therefore, his liability for his conduct is a nondischargeable debt for "willful and malicious injury" under 11 U.S.C. §523(a)(6).[20]

## VI.  CONCLUSION

For the reasons set forth herein, I find, by a preponderance of the evidence, that the Debtor's debt to the Plaintiff is nondischargeable under 11 U.S.C. §523(a)(6).

Date:   March 5, 2010     _____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

[20]    Liabilities arising from an assault and battery or from sexual harassment or exploitation have been considered, in the appropriate circumstances, to be founded upon a willful and malicious injury for the purposes of §523(a)(6).  See Granoff, 250 Fed. Appx. at 495 (not precedential) (assault and battery); In re Fors, 259 B.R. 131 (B.A.P. 8th Cir. 2001) (sexual misconduct with patient); In re Longnecker, 2007 WL 634058 (Bankr. M.D.N.C. Feb. 26, 2007) (sexual exploitation of patient); In re Topakas, 202 B.R. 850 (Bankr. E.D. Pa. 1996) (sexual harassment), aff'd, 1997 WL 158197 (E.D. Pa. Mar. 31, 1997).